JOINER, Judge.
D.H., a 17-year-old male, was adjudicated delinquent, pursuant to a plea of true to the delinquency petition, in the Jefferson Juvenile Court for carrying a concealed pistol without a license, see § 13A-11-73, Ala.Code 1975, and for second-degree unlawful possession of marijuana, see § 13A-12-214, Ala.Code 1975. Before entering his plea, D.H. reserved the right to appeal the circuit court’s denial of his motion to suppress.
At the suppression hearing, Officer Kendra Finley testified that on May 24, 2014, she, along with her partner, Officer Theodoric McKinstry, received a call from dispatch about a “person standing outside of Little Caesar’s [pizza restaurant] twirling a sign [and] selling drugs.” Officer Finley testified that the dispatcher stated that two people had telephoned and made the report. Officer Finley testified that at the time she received the call, she and Officer McKinstry were across the street at the Kangaroo brand gas station. Officer Finley and Officer McKinstry looked out the door and saw the juvenile, later identified as D.H. Officer Finley and Officer McKin-stry went to the location and walked up to D.H. Officer Finley testified that she stated, “[H]ey, how you doing ... what’s your name. We received a call about you.” Officer Finley testified that “[D.H.] was just trying to just walk off, trying to walk away.” Officer McKinstry stated: “[C]ome on, let’s go, we’re going to pat you down for our safety.” Officer Finley testified that “[D.H.] kind of got like what do you need to do that for. You don’t need to know my name. I ain’t doing nothing.” Officer Finley and Officer McKinstry thereafter walked D.H. to the patrol car and conducted a patdown search. Officer Finley testified that Officer McKinstry felt a gun in D.H.’s pants pocket on his right side. Officer Finley testified that D.H. “pushed his body against the car for us kind of not to get [the gun].” Officer McKinstry controlled D.H. while Officer Finley retrieved the gun from D.H.’s pock *1189 et. After D.H. was placed under arrest, the officers continued the patdown search and found a bag of marijuana in D.H.’s left pants pocket, as well as $116 in his sock.
Officer McKinstry testified that on May 24, he and Officer Finley were eating lunch when they received a call about “a male standing out front of Little Caesar’s spinning a sign.”[1] Officer McKinstry testified that a male witness had called at least twice and reported that they saw D.H. “selling drugs standing in front of the store.” Officer McKinstry testified that D.H. was an employee of Little Caesar’s. Officer McKinstry testified that at first, he and Officer Finley “just looked out the window because we were right across the street from the place.” Officer McKinstry testified that he and Officer Finley drove down the street and parked behind the Little Caesar’s. Officer McKinstry and Officer Finley “walked up from the back side of [D.H.] and started asking him his name.” Officer McKinstry testified that “[D.H.] got a little fidgety, started to walk off.” Officer McKinstry testified that he and Officer Finley “blocked [D.H.] in” and told him that “we got a complaint of a male standing in front of Little Caesar’s selling things.” Officer McKinstry and Officer Finley controlled D.H. and walked him back to their vehicle. Officer McKinstry testified that “[D.H.] kind of — like he was wanting to break away from me.” Officer McKinstry testified that he and Officer Finley “started to pat [D.H.] down for our safety.” During the patdown, Officer McKinstry felt “something hard and metal, a gun.” After Officer Finley removed the gun from D.H.’s pocket, Officer McKinstry and Officer Finley continued the patdown search and found the marijuana and money as well as “a pill bottle with no name on it.”
After the testimony was received, the following exchange occurred:
“[Defense counsel]: Sure. That’s fine. Thank you. Your Honor. This is — I’m happy to be able to say this is a very simple suppression issue. This is a category of Terry [v. Ohio, 392 U.S. 1 (1968),] cases of stop and frisk cases that were — you don’t get bright lines in Fourth Amendment law very much. You get the totality of the circumstances and what not.
“One of the bright lines is that .an uncorroborated anonymous tip is not sufficient to establish reasonable suspicion. This was something that the Supreme Court of the U.S. ruled on in 2000. I’ve got a copy of that decision that I’ll give to the Court and to [the prosecutor],
“[The Court]: I can agree with that.
“[Defense counsel]: I’ve highlighted some of the relevant language here. On page 1378 of the opinion — well, this case involved an anonymous tip to police that if they — that a black male wearing a plaid shirt at a certain bus stop in Miami — a specified bus stop in Miami was— had a gun. So, police went to the bus stop and they saw someone fitting that description in a matter of minutes after the tip. They didn’t see anything that independently corroborated the fact that he had a gun. They simply saw the person who had been described by the anonymous informant.
“[The Court]: Let me ask you this, [Defense counsel].
“[Defense counsel]: Sure. Yes, sir.
*1190 “[The Court]: If somebody called the police and told them a body was laying out on 1-65 somewhere, what do you think they should do about it?
“[Defense counsel]: Well, first of all, I guess there are a few issues here. One is that the — in Florida v. J.L.[, 529 U.S. 266, 120 S.Ct. 1375 (2000),] in this case, one thing that Justice Kennedy pointed out is that this is dealing with a report of a gun and that does not necessarily mean that an anonymous — uncorroborated anonymous report of a bomb, for instance, would be insufficient because they’re different levels of danger there.
“[The Court]: If they get a report of either a bomb or a body, do you think that it would be incumbent upon the police department to investigate?
“[Defense counsel]: That is exactly what the Supreme Court says. Yes. It is their role to investigate it and to— through independent investigation to corroborate the anonymous tipster’s allegations. But until they have independently corroborated some of the anonymous informant’s allegations, they don’t have reasonable suspicion. So, if they show up and they aren’t — and they don’t corroborate anything and they immediately seize the person and set about patting them down, that’s not investigation. That is—
“[The Court]: Is that on point with the facts that I’m hearing here?
“[Defense counsel]: Judge, I would say that—
“[The Court]: What I’m hearing from the officers here is that they approached the young man and asked him — attempted to ask him questions.
“[Defense counsel]: Yes, sir.
“[The Court]: And I would think that would be in the nature- of an investigation.
“[Defense counsel]: Exactly.
“[The Court]: Now, the testimony— he testified that he started walking off.
“[Defense counsel]: Yes, sir. I can address that, if you’d like.
“[The Court]: At that particular point, what is the officer supposed to do?
“[Defense counsel]: Sure. I will — I have a case on that, Your Honor. This case is W.D.H. v. State [, 16 So.3d 121 (Ala.Crim.App.2008) ]. It’s from the Court of Criminal Appeals. It says when an officer without reasonable suspicion or probable cause approaches an individual, the individual has a right to ignore the police and go about his business. That is the highlighted text on page 126 of the opinion. And any refusal to cooperate without more, does not furnish the minimal level of objective justification needed for a detention or seizure. Then it goes on on the following page of the opinion to say W.D.H. was within his rights to walk away when he saw the police on the street.
“There’s a statement from another case called United States v. [Mendenhall, 446 U.S. 544 (1980)]. The statement there was that a police officer just like anyone else has the right to approach a citizen and direct questions to the citizen, but the citizen has the right to ignore the officer and walk away.
“[The Court]: What page are you on?
“[Defense counsel]: The last part that I was saying is from United States v. [Mendenhall ], which is not here. I mean, the highlighted text in W.D.H, makes this clear enough that when an officer who doesn’t have reasonable suspicion as the first case I gave you shows an anonymous tip without any corroboration does not furnish reasonable suspicion. Then if the — if the person ignores the officer and goes about their business *1191 or walks away from the officer, then that is not something that would furnish reasonable suspicion where none existed.
“I also have copies of two cases involving this same issue, an uncorroborated anonymous tip where police got a report that a person had a gun and the — and they were — they did not corroborate any of the details of the report before they showed up. These are both Court of Criminal Appeals. They did begin in this court. The Court of Criminal Appeals reversed the finding of reasonable suspicion saying that they were acting solely on the anonymous tip.
“I think that Florida v. J.L. really spells this out pretty well. It says the officer’s suspicion that J.L. was carrying a weapon arose not for any observations [of] their own, but solely from a call made from an unknown location by an unknown caller unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated. An anonymous tip alone seldom demonstrates the informant’s basis of knowledge or veracity. There are situations in which an anonymous tip suitably corroborated sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.
“Here there was no corroboration. Officer Finley testified that as they walked up, they said — she said one of them said, hey, how are you doing. Officer McKinstry said that they were going to pat him down. At that point, he appeared — he started to appear nervous. The moment they say we’re going to pat you down, they have seized him. That is a Terry stop when you say to a person — because a person would not feel free to ignore the officers and go about their business at that point. At that point, they had not corroborated anything. Him walking away is not corroboration. It’s a constitutional right of his to ignore them if they don’t have reasonable suspicion that — to stop him or to frisk him. This is an uncorroborated anonymous tip. It falls right under Florida v. J.L., B.J.C. v. State, [992 So.2d 90 (Ala.Crim.App.2008),] C.D.M. v. State [, 68 So.3d 1285 (Ala.Crim.App. 2010) ]. It’s a pretty clean cut and dried case, Your Honor.
“[The Court]: Thank you.”
(R. 24-27.) After rebuttal, the juvenile court noted that “I think this is a close decision ... I’m going to deny your motion to suppress.” (C. 29.) As noted above, D.H. pleaded true to the petition and was found delinquent. This appeal follows.
“ ‘When an appellate court reviews the findings and holdings of a trial court resulting from a hearing on a motion to suppress evidence, if the evidence before the trial court was undisputed, the “ore tenus rule,” pursuant to which the trial court’s conclusions on issues of fact are presumed correct, is inapplicable, and the reviewing court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court’s application of the law to those facts.’ ”
B.J.C. v. State, 992 So.2d 90, 91 (Ala.Crim. App.2008) (quoting Ex parte Kelley, 870 So.2d 711, 714 (Ala.2003)).
On appeal, D.H. argues that the juvenile court erred in denying his motion to suppress because, he says, the officers lacked reasonable suspicion to conduct a patdown search “based solely on uncorroborated anonymous calls that he was selling drugs.” (D.H.’s brief, p. 8.) Relying on the United States Supreme Court’s decision in Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), as well as this Court’s decisions in B.J.C. v. State, supra, and C.D.M. v. State, 63 So.3d 1285 (Ala.Crim.App.2010), D.H. argues that *1192 “[the officers] frisked him without corroborating any aspect of the tip or observing anything to suggest that he was armed and dangerous.” (D.H.’s brief, p. 8.) We agree.
In B.J.C. v. State, 992 So.2d 90, 91 (Ala. Crim.App.2008), this Court held:
“In [Florida v.] J.L., [529 U.S. 266 (2000),] an anonymous caller reported to the police that a young black male was at a particular bus stop wearing a plaid shirt and that he was carrying a gun. Officers went to the bus stop, where they saw three black males. One of the males, J.L., was wearing a plaid shirt. The officers stopped and frisked the males. A gun was seized from J.L.’s pocket. The United States Supreme Court held that an anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer’s stop and frisk of that person.
“ ‘Our “stop and frisk” decisions begin with Terry v. Ohio, 392 U.S. 1 (1968). This Court held in Terry:
“ ‘ “[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.” Id., at 30.
“ ‘In the instant case, the officers’ suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see Adams v. Williams, 407 U.S. 143, 146-147 (1972), “an anonymous tip alone seldom demonstrates the informant’s basis of knowledge or veracity,” Alabama v. White, 496 U.S. [325], at 329 [ (1990) ]. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits “sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.” Id., at 327. The question we here confront is whether the tip pointing to J.L. had those indicia of reliability.
“ ‘In White, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel. Ibid. Standing alone, the tip would not have justified a Terry stop. 496 U.S., at 329. Only after police observation showed that the informant had accurately predicted the woman’s movements, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine. Id., at 332. Although the Court held that the suspicion in White became reasonable after police surveillance, we regarded the *1193 case as borderline. Knowledge about a person’s future movements indicates some familiarity with that person’s affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband. We accordingly classified White as a “close case.” Ibid.
“ ‘The tip in the instant case lacked the moderate indicia of reliability present in White and essential to the Court’s decision in that case. The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant’s knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L. If White was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.
“ ‘Florida contends that the tip was reliable because its description of the suspect’s visible attributes proved accurate: There really was a young black male wearing a plaid shirt at the bus stop. Brief for Petitioner 20-21. The United States as amicus curiae makes a similar argument, proposing that a stop and frisk should be permitted “when (1) an anonymous tip provides a description of a particular person at a particular location illegally carrying a concealed firearm, (2) police promptly verify the pertinent details of the tip except the existence of the firearm, and (3) there are no factors that cast doubt on the reliability of the tip.... ” Brief for United States 16. These contentions misapprehend the reliability needed for a tip to justify a Terry stop.
“ ‘An accurate description of a subject’s readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. Cf. 4 W. La-Fave, Search and Seizure § 9.4(h), p. 213 (3d ed.1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases).
“ ‘A second major argument advanced by Florida and the United States as amicus is, in essence, that the standard Terry analysis should be modified to license a “firearm exception.” Under such an exception, a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing. We decline to adopt this position.
“ ‘Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; Terry ⅛ rule, which permits protective *1194 police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. See 392 U.S., at 30. But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target’s unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms. Several Courts of Appeals have held it per se foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well. See, e.g., United States v. Sakyi, 160 F.3d 164, 169 (C.A.4 1998); United States v. Dean, 59 F.3d 1479, 1490, n. 20 (C.A.5 1995); United States v. Odom, 13 F.3d 949, 959 (C.A.6 1994); United States v. Martinez, 958 F.2d 217, 219 (C.A.8 1992). If-police officers may properly conduct Terry frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in Adams and White, the Fourth Amendment is not so easily satisfied. Cf. Richards v. Wisconsin, 520 U.S. 385, 393-394 (1997) (rejecting a per se exception to the “knock and announce” rule for narcotics cases partly ■because “the reasons for creating an exception in one category [of Fourth Amendment cases] can, relatively easily, be applied to others,” thus allowing the exception to swallow the rule).
“ ‘The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk. Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports, see Florida v. Rodriguez, 469 U.S. 1 (1984) (per curiam), and schools, see New Jersey v. T.L.O., 469 U.S. 325 (1985), cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.
“ ‘Finally, the requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer’s prerogative, in accord with Terry, to conduct a protective search of a person who has already been legitimately stopped. We speak in today’s decision only of cases in which the officer’s authority to make the initial stop is at issue. In that context, we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in Adams and White does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.’
“Florida v. J.L., 529 U.S. at 269-74, 120 S.Ct. 1375 (footnote omitted).”
B.J.C., 992 So.2d at 91-95.
In the present case, as in J.L., Officers Finley and McKinstry were not *1195 justified in the stop and frisk of D.H. Despite having been across the street and within viewing range of D.H., the officers failed to conduct any independent police work sufficient to corroborate the tip from the anonymous informant. Even though the officers had an accurate description of D.H., this information lacked an “indicia of reliability” to provide the officers with reasonable suspicion to make the investigatory stop. See B.J.C., 992 So.2d at 92 (“The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person”).
An argument made by the State is that the search was lawful because, it said, “D.H. tried to walk away from the officers when they asked him for identification.” (State’s brief, p. 9.) This argument, however, is unpersuasive. In W.D.H. v. State, 16 So.3d 121 (Ala.Crim.App.2008), the evidence showed that police had been receiving complaints “of a person shooting and selling drugs in a certain block in Tulane Court.” 16 So.3d at 123. Based on the complaint, several officers from the Montgomery Police Department narcotics bureau responded to the scene. After he arrived, Detective W.B. Hamil testified that he approached W.D.H. and two other people. Det. Hamil “stopped W.D.H. because he looked nervous and he had begun walking away.” After stopping W.D.H., Det. Hamil testified that he conducted a patdown search for officer safety and that, as a result, he removed marijuana from W.D.H.’s pocket. In reversing the circuit court’s denial of the motion to suppress, this Court held:
“The circumstances in this case are analogous to those in Ex parte James, 797 So.2d 413 (Ala.2000), in which the Alabama Supreme Court determined that the stop and search of the defendant were unconstitutional. In James, a police officer was patrolling an area known as a high drug-crime area when he noticed a van pulled over on the side of the road. Two or three people outside the van were talking into the van’s window, but the officer could not see what, if anything, James, who was driving the van, and the others were doing. Id. at 414.
“When the officer approached the van, the people outside the van ran, and James pulled onto the road and drove away. The officer followed the van and pulled it over at a service station. James got out of the van and approached the officer, who asked whether the driver had any weapons. James said that he did not, and the officer replied that he had to conduct a pat-down search anyway for safety reasons. At that time, James reached toward his pocket. The officer tapped James’s hand out of the way and reached into the pocket for which James had been reaching. The officer found marijuana cigarettes in the pocket. Id.
“In finding that the trial court improperly denied James’s motion to suppress because the stop was unconstitutional, the Alabama Supreme Court noted that Terry provides:
“ ‘[A] police officer may conduct a brief investigatory stop of a person if the officer has a reasonable suspicion supported by “specific and articuable [sic] facts” that the individual is, or is about to be, involved in criminal activity. The officer may also conduct a patdown search of the outer clothing of the person if the officer “is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others.” ’
*1196 “James, 797 So.2d at 414-15 (emphasis in James), quoting Terry, 392 U.S. at 24, 88 S.Ct. 1868.”
W.D.H., 16 So.3d at 126. Here, Officers Finley and McKinstry stopped and frisked D.H. after having received an anonymous tip that, as noted above, was not sufficiently corroborated. The officers did not point to “ ‘specific and articulable facts’ that [D.H.] [was], or [was] about to be, involved in criminal activity.’” W.D.H., 16 So.3d 121, 126 (Ala.Crim.App.2008). Thus, the officers were not “justified in believing that [D.H.] ... [wa]s armed and presently dangerous.” W.D.H., supra. Based on the facts in this ease, D.H. was within his rights to walk away from the police, and the circuit court erred in denying D.H.’s motion to suppress the evidence seized from D.H.’s person.
Accordingly, we reverse the judgment of the circuit court and remand this cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
WINDOM, P.J., and WELCH, KELLUM, and BURKE, JJ., concur.

. Officer McKinstry described "spinning a sign at the Little Caesar’s” as "[p]art of their advertisement, they stand on the corner and they twirl a sign, flip it. Some of them dance.” (R. 15.)